1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    J.M.,
                                              Case No.  20-cv-07196-JCS
                   Plaintiff,
8
         v.                                   **ORDER GRANTING PLAINTIFF'S**
9                                             **MOTION FOR SUMMARY**
     KILOLO KIJAKAZI,                         **JUDGMENT AND DENYING**
10                                            **DEFENDANT'S CROSS-MOTION FOR**
                   Defendant.                 **SUMMARY JUDGMENT**
11
                                              Re: Dkt. Nos. 25, 28
12

**I.    INTRODUCTION**

On October 11, 2018, Plaintiff J.M.[1] applied for disability insurance benefits and

supplemental security income under Titles II and XVI of the Social Security Act, alleging

disability beginning September 30, 2016.   The claim was denied initially and upon

reconsideration, and an administrative law judge ("ALJ") held a video hearing on March 3, 2020.

On April 30, 2020, the ALJ denied J.M.'s application, and on August 28, 2020, the Appeals

Council denied review of J.M.'s appeal of the ALJ's decision, making it the final decision of the

Defendant Commissioner of the Social Security Administration ("Commissioner").  After the

Appeals Council denied review, J.M. sought review in this Court pursuant to 42 U.S.C. § 405(g).

Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons

stated below, the Court GRANTS J.M.'s Motion for Summary Judgment, DENIES the

Commissioner's Motion for Summary Judgment, and REMANDS for an immediate calculation

and award of benefits.[2]

---

[1] Because opinions by the Court are more widely available than other filings and this Order
contains potentially sensitive medical information, this Order refers to Plaintiff using only her
initials.
[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C.
§ 636(c).

## II.   REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A.   The Five-Step Framework

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).[3] If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ

---

[3]The Court cites the regulations applicable to disability insurance benefits applications because the parallel SSI regulations are virtually identical.

1    determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

2         At step three, the ALJ compares the medical severity of the claimant's impairments to a

3    list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20

4    C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination

5    of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

6    disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

7         At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and

8    past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still

9    do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's]

10   case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's

11   RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).

12   Past relevant work is "work that [a claimant] has done within the past fifteen years, that was

13   substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."

14   20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the

15   ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work,

16   then the ALJ proceeds to step five.

17        At step five, the Commissioner has the burden to "identify specific jobs existing in

18   substantial numbers in the national economy that the claimant can perform despite [the claimant's]

19   identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v.

20   Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the

21   claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and

22   entitled to benefits if there are not a significant number of jobs available in the national economy

23   that the claimant can perform.  *Id.*

24        **B.    Supplemental Regulations for Determining Mental Disability**

25        The Social Security Administration has supplemented the five-step general disability

26   evaluation process with regulations governing the evaluation of mental impairments at steps two

27   and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner

28   must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R.

United States District Court
Northern District of California

3

§ 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2)  interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.   20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520a(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at 12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the

United States District Court
Northern District of California

claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . "  Social Security Ruling 96-8p, 1996 WL 374184, at *4.

## III.    BACKGROUND

J.M. was a forty-five year-old woman at the time of her alleged onset date.  She has a history of psychiatric hospitalizations dating back to 2009, following a divorce and the loss of custody of her child.  Administrative Record ("A.R.") 424, 1108.  She previously worked as a flight attendant for eighteen years and also as a Transportation Security Administration ("TSA") officer with Homeland Security.  *Id.* at 1008.  Prior to sobriety in 2018, J.M. drank heavily and considered herself a "functioning alcoholic."  *Id.*  She fell out of a moving truck in November 2017, and suffered numerous injuries, including hematomas in her head and body and a fractured sacrum.  *Id.* at 860, 862-63, 886, 892-93.  She was subsequently hospitalized for several days and was treated for alcohol withdrawal.  *Id.* at 1858.

J.M. suffers from several hepatic impairments, neuropathy, and anxiety and depression, among other conditions.  *Id.* at 18-21.  The impairments and their symptoms have left J.M. unable to work and in need of frequent medical attention, including hospitalization.  *Id.* at 52-53, 694. At the time of her 2020 hearing, J.M. lived with her boyfriend, and he assisted J.M. with her care and daily activities like grocery shopping, doctor visits, and laundry.  *Id.* at 71, 354.

### A.    Summary of Medical Treatment

In March 2018, J.M. was seen by Dr. Robin Barnes at the Redwoods Rural Health Clinic in Redway, California, at which time she complained of "bilateral feet stinging" and elevated liver enzymes.  *Id.* at 992.  Her abdominal exam was normal, and the doctor noted that she had no ascites, palpable mass, or hepatic bruit.  *Id.* at 993.  She underwent liver enzyme testing, and the results subsequently came back normal.  *Id.* at 996.  The doctor prescribed medication for the

1    neuropathy in her feet.  *Id.* at 993.

2        In May 2018, J.M. returned to the Redwoods Rural Health Clinic, at which time she was

3    diagnosed with a fatty liver and alcohol dependence.  *Id.* at 998.  It was recommended that she

4    reduce her alcohol dependence.  *Id.*  The next month, in June 2018, the same clinic treated J.M. for

5    increasing numbness in her feet.  *Id.* at 1006.  The Redwoods Rural Health Clinic also referred

6    J.M. to a neurologist in Eureka, California.  *Id.*  She returned to the Redwoods Rural Health Clinic

7    on June 22, 2018, complaining that she had experienced chest pain and reporting that she had

8    reduced her alcohol intake to one glass of wine per day.  *Id.* at 1007.  She had an

9    electrocardiogram ("EKG"), which revealed "possible old Q wave changes," and she was referred

10   to a cardiologist in Eureka, California.  *Id.* at 1009-10.

11       On July 2, 2018, Dr. Barnes of Redwoods Rural Health Clinic notified J.M. that "[i]n

12   regards to your recent labs[,] [y]our liver function, platelet levels and blood levels are improved.

13   You are making progress and you are doing much better, according to your labs."  *Id.* at 1011.

14   That same day, on July 2, 2018, J.M. visited the cardiology department at St. Joseph Health in

15   Eureka, California following her complaints of chest pain.  *Id.* at 638.  An examination and tests

16   revealed normal results, including those from an EKG.  *Id.* at 636, 640-48.

17       Later that fall, in September 2018, J.M. attended counseling sessions at Redwoods Rural

18   Health Clinic with Dr. Holland.  *Id.* at 1014.  Around the same time, on September 10, 2018, J.M.

19   was seen by the neurology department at St. Joseph Health in Eureka, California.  *Id.* at 1070-78.

20   At that time, she had a nerve conduction study that suggested "very mild axonal polyneuropathy."[4]

21       Subsequently, on September 14, 2018, Dr. Barnes at the Redwoods Rural Health Clinic

22   noted that J.M. was suffering from insomnia and elevated blood pressure in addition to alcohol

23   dependence.  *Id.* at 1015.  J.M. reported that she had resorted to drinking again to help her sleep.

24   *Id.*

25   _____

26   [4] "Axonal polyneuropathy" or "axon loss polyneuropathy" is defined as "a type of polyneuropathy
27   in which axon degeneration is the sole or predominant feature; it has many etiologies, particularly
     toxic and metabolic; nerve conduction studies show that it affects the amplitude of the responses
28   but does not cause conduction slowing or block."  Stedmans Medical Dictionary § 709630 (Nov.
     2014).

United States District Court
Northern District of California

1    On October 8, 2018, J.M. returned to the cardiologist at St. Joseph Health in Eureka,

2    California.  *Id.* at 634.  Upon examination, she had an enlarged liver and jaundiced skin.  *Id.* at

3    636.  She was referred to the emergency room for alcoholic hepatitis evaluation, and Dr. Phillip

4    Scheel recommended she discontinue all alcohol.  *Id.* at 637.

5         She was subsequently admitted to the St. Joseph Hospital in Eureka that same day, October

6    8, 2018, for jaundice, and a history of chronic alcohol abuse, severe alcohol withdrawal, and

7    hypertension, and she remained hospitalized until October 26, 2018.  *Id.* at 694.  During her

8    hospitalization, she suffered from "altered mental status and paranoia and psychosis."  *Id.*  She

9    also had "an elevated ammonia level consistent with hepatic encephalopathy," and "a moderate

10   amount of ascites in [four] quadrants."  *Id.*  On October 23, 2018, days prior to J.M.'s hospital

11   discharge, Dr. Michael Fratkin from ResolutionCare, a palliative care facility in Eureka,

12   California, opined that J.M. met the criteria for palliative care based upon her "end stage liver

13   disease and social challenges."  *Id.* at 652-55.  He further opined that J.M.'s "death within a year

14   would not be unexpected based on clinical status," *Id.* at 653, 917, and that she had irreversible

15   liver damage, ascites, and hepatic encephalopathy.  *Id.* at 655, 917.  Upon her discharge from the

16   hospital on October 26, 2018, it was recommended that she follow up with a psychiatrist and

17   regarding her "liver mass."  *Id.* at 695.

18        J.M. then saw Dr. Sand, a treating family medicine provider at ResolutionCare in Eureka,

19   California, on December 10, 2018, for a follow-up visit after her October 2018 hospitalization.  *Id.*

20   at 658, 694, 911.  In his treatment records from that visit, Dr. Sand noted that both J.M.'s physical

21   and mental condition had improved since October 2018, but that she continued to have some

22   memory difficulties and pain.  *Id.* at 911-12.

23        Days later, Dr. Fratkin, from ResolutionCare's palliative care facility in Eureka, California,

24   offered a second opinion in support of J.M.'s benefits application.  He noted that J.M. was his

25   patient, and stated:  "She has end stage liver disease with cirrhosis and hepatic encephalopathy

26   which impairs thinking and clouds judgment.  It is imperative that processing of [J.M.'s]

27   application be prioritized due to her significant medical issues which threaten both her quality of

28   life and the remaining time she has left."  *Id.* at 908.

United States District Court
Northern District of California

1    Subsequently, on December 14, 2018, J.M. was examined and evaluated by California

2  Pacific Medical Center ("CPMC") hepatologist, Dr. Adil Wakil, in San Francisco, California.  *Id.*

3  at 951-53, 1730-1823.  Dr. Wakil noted that J.M. was being evaluated for alcohol-related liver

4  disease and that she had "longstanding history of alcohol use disorder." *Id.* at 951.  According to

5  Dr. Wakil, J.M.'s recent hospitalization was due to encephalopathy, alcoholic hepatitis, jaundice,

6  ascites, wasting, and confusion.  *Id.*  Dr. Wakil noted improvement because J.M. had stopped

7  drinking alcohol since her hospitalization.  *Id.* at 953.  He noted that her ascites had resolved, but

8  that she was "still quite malnourished," and opined that she had "significant underlying chronic

9  liver disease." *Id.*  He could not conclude whether she had cirrhosis but suspected that she did

10  have advanced liver fibrosis.  *Id.*  J.M.'s encephalopathy was mild then, but she suffered from

11  painful neuropathy that Dr. Wakil noted "may not get better over time."  *Id.*

12    In January 2019, Dr. Amon, a state agency non-examining physician opined that J.M.

13  could perform a reduced range of light work with standing and walking limited to two hours per

14  day.  *Id.* at 97.

15    J.M. subsequently followed up with Dr. Sand again on March 28, 2019, for her hepatic

16  encephalopathy and cirrhosis of the liver.  *Id.* at 1122.  That visit occurred a few weeks after an

17  ultrasound revealed that J.M.'s hepatic mass had increased in size.  *Id.* at 1233-34.  Dr. Sand noted

18  at that visit that J.M. had an "undiagnosed liver mass that is enlarging," and that her resulting pain

19  was a six out of ten.  *Id.* at 1125.  He noted that she "had some good days and many bad ones,"

20  and that she experienced "a lot" of cognitive impairment and confusion.  *Id.*  He discussed the use

21  of methadone with J.M. because her "enlarged liver and damaged nerves [were] requiring a

22  stronger medicine that has the properties to relieve her pain better."  *Id.*

23    On June 6, 2019, Dr. Fratkin from ResolutionCare's palliative care offered his third

24  opinion that J.M. continued to meet the criteria for palliative care based on end stage liver disease

25  with multiple complications and severe functional impairment.  *Id.* at 1118.  A few months later,

26  in a June 18, 2019, statement in support of [J.M.'s] benefits application, Dr. Sand opined that J.M.

27  was

28        unable to resume any type of gainful employment due to physical impairment.  Her
       fatigue, pain, weakness, and other symptoms would significantly and consistently

United States District Court
Northern District of California

interfere with work performance and attendance.  [J.M.] has and will see a continued
decline in function over time, which is expected to last longer than [twelve] months,
and/or continue until her death.

*Id.* at 1117.  In support, Dr. Sand explained that J.M. was diagnosed with "terminal" end stage

liver disease and cirrhosis of the liver.  *Id.*  He observed that [J.M.]'s symptoms included "chronic

pain, neuropathy, edema, weakness, fatigue drowsiness, nausea, vomiting, confusion,

depression[,] and anxiety," and that both "her symptoms and overall quality of life have continued

to decline."  *Id.*  Around this same time, in June 2019, a magnetic resonance imaging ("MRI")

revealed J.M. had a liver mass consistent with a regenerating nodule.  *Id.* at 1643-44.

On September 19, 2019, after a follow-up visit, Dr. Sand

noted J.M. had been sober for nearly one year and opined that she had "good control of most

symptoms of [advanced liver disease]."  *Id.* at 1695.  Additionally, J.M's cirrhosis had improved,

and her hepatic encephalopathy was controlled on medications.  *Id.*  However, she continued to

suffer from chronic neuropathy.  *Id.*  Soon thereafter, on September 30, 2019, a Doppler imaging

showed that the mass in J.M.'s liver was stable.  *Id.* at 1845.

On October 1, 2019, J.M. was seen by Nurse Practitioner, Marice Thomas, at CPMC in

Eureka, California, for a follow-up from April 2018 regarding J.M.'s liver disease.  *Id.* at 1622-23.

Nurse Thomas noted that J.M. suffered from "chronic and ongoing complaints of abdominal pain,

chest pain, confusion, depression," and insomnia, among other conditions.  *Id.* at 1622.  Nurse

Thomas opined that J.M. had "[l]ikely early cirrhosis secondary to alcohol history, compensated

with low MELD 7.[5]  She has shown significant improvement in the past year.  She was advised to

continue to remain completely alcohol free."  *Id.*  Thomas discussed a liver transplant with J.M.

and noted that she was not a candidate because it was not "clear that [she] ha[d] liver failure."  *Id.*

On October 16, 2019, Dr. Williams, another state agency non-examining physician

confirmed the prior state agency non-examining physician Dr. Amon's January 2019 RFC opinion

---

[5] "MELD" is an acronym for "model for end-stage liver disease," and "MELD score is the score
provided to patients based on how urgently they need a liver transplant in the next three months."
Mayo Clinic Transplant Staff, *The MELD Score: Definitions and Frequently Asked Questions*,
Mayo Clinic Connect (March 1, 2022, 12:59 pm.),
https://connect.mayoclinic.org/blog/transplant/newsfeed-post/the-meld-score-definitions-and-
frequently-asked-questions/.

1  that J.M. could perform a reduced range of light work with standing and walking limited to two

2  hours per day.  *Id.* at 140.

3      Less than two months later, though, at a November 6, 2019, follow-up for "palliative care

4  provided for advanced alcoholic liver disease complicated by ascites and encephalopathy" with

5  Dr. Sand, J.M.'s health had declined.  *Id.* at 1691-92.  Dr. Sand noted that J.M.'s "hepatic failure is

6  slowly worsening.  She is barely able to care for herself at home safely, certainly not capable of

7  gainful employment based on presentation today.  She needs ongoing support to help her

8  compensate for her cognitive impairment."  *Id.* at 1692.  He further observed that J.M. was "quite

9  fatigued, eating poorly, spending most of her time sleeping," and that she suffered from "daily

10  cognitive difficulties with memory, concentration, and speech."  *Id.* at 1691.

11     In conjunction with the November 2019 visit, Dr. Sand completed an assessment of J.M.'s

12  functional work capacities.  *Id.* at 1386-1389.  The assessment noted that J.M. had been diagnosed

13  with alcoholic liver disease, cirrhosis, and peripheral neuropathy, and that her symptoms included

14  extreme fatigue, poor memory, confusion, intractable pain in her abdomen, anxiety, and depressed

15  mood.  *Id.* at 1386.  The assessment also evaluated J.M.'s capacity to work on a function-by-

16  function basis.  Both parties and the ALJ agree that based on Dr. Sand's functional evaluations, he

17  was, in effect, ultimately opining that J.M. was capable of less than sedentary work.  *Id.* at 28.[6]

18  **B.      Mental Health Reports and Opinions**

19     As noted above, in September 2018, a clinical social worker from the Redwoods Rural

20  Health Center examined J.M. *Id.* at 1013-14.  He noted that J.M. was "wobbly and [had] difficulty

21  walking straight." *Id.* at 1013.  She had been a victim of a crime, had also lost her brother to

22  crime, and was suffering from extreme anxiety and fear related to those events.  *Id.*  In general, he

23  found J.M. depressed and anxious.  *Id.*

24     During J.M.'s subsequent hospitalization in October 2018, psychiatrist Dr. Robert Soper

25  examined her.  *Id.* at 713-25.  He noted that she was hallucinating and that she was experiencing

26  chronic liver failure.  *Id.* at 717, 725.  J.M.'s "motor movement [was] slow," and she was suffering

27

28  _____
[6] Dr. Sand did not state that ultimate opinion, though, in his assessment.  *Id.* at 1386-89.

United States District Court
Northern District of California

1    from post-traumatic stress syndrome and Wernicke-Koroskoff's psychosis[7] and/or hepatic

2    encephalopathy.  *Id.* at 718-19.  Dr. Soper adjusted J.M.'s medications.  *Id.*  He noted that J.M.

3    begged him to leave the hospital, but that she "ha[d] no insight into how ill she still is."  *Id.* at 724.

4           On March 23, 2019, examining consultative psychologist, Dr. Sara Bowerman, met with

5    J.M.  *Id.* at 1107-15.  Dr. Bowerman observed that J.M. presented as both depressed and anxious

6    during the visit, and she administered several tests, including the Wechsler intelligence and

7    memory tests.  *Id.* at 1112.  Dr. Bowerman ultimately concluded that J.M. was mildly impaired in

8    her ability to ability to understand, remember, and carry out simple one or two-step job

9    instructions.  *Id.* at 1116.  According to Dr. Bowerman, J.M. also suffered from mild functional

10    impairments in the following categories "due to her depressive and anxiety disabilities and

11    substance use:"  (1) ability to understand, remember, and carry out detailed but uncomplicated job

12    instructions; (2) ability to understand, remember, and carry out an extensive variety of technical

13    and/or complex job instructions; (3) ability to maintain concentration, attention, and for pacing,

14    tracking, and scanning; (4) ability to respond to usual work situations (attendance, safety, etc.);

15    and (5) ability to deal with changes in a routine work setting.  *Id.*  Dr. Bowerman further opined

16    that J.M. possessed moderate to marked impairments in her ability to interact with others in

17    socially acceptable ways and in her ability to respond appropriately to co-workers and supervisors.

18    *Id.*

19           Approximately one month after Dr. Bowerman's examination, on April 16, 2019, Dr.

20    Beverly Westra, a state agency non-examining psychological consultant similarly concluded that

21

22    [7] "Wernicke-Korsakoff syndrome

23           is a brain disorder caused by lack of thiamine (vitamin B1) that may result in lasting
           brain damage.  [It] is sometimes diagnosed as two separate conditions: Wernicke's

24           encephalopathy and Korsakoff syndrome.  Generally, though, they [are] considered to
           be different stages of the same disorder, both caused by too little thiamine in a person's

25           body.  [I]n advanced cases, even with treatment, the disorder's effect on memory and
           other thinking skills can be permanent.

26    Neill Graff-Radford, M.D., Neurology, Mayo Clinic, *Prompt Diagnosis and Treatment May*

27    *Eliminate Symptoms of Brain Disorder*, Mayo Clinic News Network (March 1, 2022, 1:07 p.m.),
    https://newsnetwork.mayoclinic.org/discussion/prompt-diagnosis-and-treatment-may-eliminate-

28    symptoms-of-brain-
    disorder/#:~:text=Answer%3A,eventually%20can%20be%20life%2Dthreatening.

United States District Court
Northern District of California

1    J.M. suffered from depressive and anxiety disorders.  *Id.* at 95.  She found that J.M. possessed

2    moderate limitations in the following four categories:  (1) J.M.'s ability to understand, remember,

3    or apply information; (2) J.M.'s ability to interact with others; (3) J.M.'s ability to concentrate,

4    persist, or maintain pace; and (4) J.M.'s ability to adapt or manage oneself.  *Id.*

5         On September 10, 2019, another state agency non-examining consulting psychologist

6    issued a report based on her review of J.M.'s medical record.  *Id.* at 138.  Dr. Kresser did not

7    entirely agree with Dr. Westra's prior assessment.  *See id.* at 138 (suggesting that Dr. Westra's

8    findings were "[n]ot totally consistent with the preponderance of the evidence").  Contrary to Dr.

9    Westra, Dr. Paula Kresser opined that J.M. possessed only mild limitations in three out of four

10   categories.  Dr. Kresser found J.M. was moderately limited only in her ability to interact with

11   others.  *Id.*

12        **C.      J.M.'s Statements and Testimony**

13        **1.      Adult Function Reports**

14        J.M. completed two Adult Function Reports in conjunction with her benefits application.

15   *Id.* at 305-12, 351-60.  She completed the first report in December 2018, following her October 8-

16   26, 2018 hospitalization.  *Id.* at 305-312.  She described her typical day, which was extremely

17   limited.  J.M. stated that she routinely gets out of bed, uses the restroom, changes her diaper, takes

18   medications, watches television, and makes a lot of calls to doctors and regarding her insurance.

19   *Id.* at 306.  She has difficulty with her personal care and requires some help dressing and

20   sometimes using the bathroom.  *Id.*  She typically drinks Ensure or other shake boosts and can

21   only prepare very simple meals for herself like toast and soup.  *Id.* at 306-07.  In terms of

22   household chores, she is only able to work for two to five minutes before she feels nauseated,

23   falls, or has spasms.  *Id.* at 307.  She does not drive because of her balance, memory, and fatigue,

24   and she needs help with bills and handling money because she cannot concentrate, remember, or

25   see well due to her jaundice.  *Id.* at 308.

26        J.M.'s hobbies include watching television and playing cards.  *Id.* at 309.  She also gets

27   books from the library.  *Id.*  She is limited in her activities - including all physical activities - by

28   her condition and pain, and she is limited in other non-physical activities because of her poor

United States District Court
Northern District of California

memory, dizziness, and inability to focus.  *Id.*  J.M. noted that she "basically can't do much on [her] own.  [She] want[s] to but [she] is limited and get[s] frustrated, sick, and is in a lot of pain. [She] can't focus or think clearly[,] which scares [her.]"  *Id.* at 312.

Approximately six months later, in June 2019, J.M. completed a second Adult Function Report, which is largely consistent with her first report.  *Id.* at 351-59.  Notably, she "quit drinking alcohol [in] October 2018," following completion of her first Adult Function Report.  *Id.* at 356. Her reported daily activities were similar to those she listed in her December 2018 report, and she additionally noted that she tries to "sort bills" and prepare a "to-do list."  *Id.* at 352.  J.M. reported many of the same limitations and conditions that she detailed in her first report.  Again, she noted that she "can only handle max[imum] five minutes" completing chores like doing the dishes or folding laundry or she experiences extreme pain.  *Id.* at 353.  She only leaves the house once a week at the most because she needs someone to drive and "guide [her] through whatever [she] is out doing." *Id.* at 354.  She asserted that she "can't do anything physical anymore [because she's] too weak, confused, and all-over body sore."  *Id.* at 355.  J.M. opined that she was unable to work based on her lack of concentration and memory, nausea, dizziness, fatigue, insomnia, diarrhea, vomiting, shortness of breath,  back, neck, and shoulder pain, and neuropathy in her extremities. *Id.* at 351.

### 2.       March 2020 Hearing

At J.M.'s March 2020 hearing, she testified that she has days where her illness will "take over," and she is unable to get out of bed.  *Id.* at 51.  As a result, she asserted that she is unable to work a full-time job because jobs do not exist where she could miss work and/or lie down as needed.  *Id.* at 52-53.  J.M. is typically only able to leave home two days a week for doctor appointments, and when she returns home, she needs to go back to bed and will often stay in bed for days afterward because she has exhausted herself by leaving home.  *Id.* at 52, 55.

J.M. suffers from neuropathy, which causes numbness and pain in her feet and hands.  *Id.* at 57-58.  Her liver condition also causes her torso to swell, and she is often unable to tolerate pain medications due to her liver.  *Id.* at 64.  As a result, her pain is frequently uncontrolled and causes nausea.  *Id.*  She suffers from spontaneous diarrhea, which requires her to wear a diaper, and

impedes her ability to leave home.  *Id.* at 64.

In terms of her daily care, she has difficulty doing laundry and washing dishes because her hands go numb.  *Id.* at 59.  Her boyfriend does the grocery shopping.  *Id.* at 71.  She can do a limited amount of cooking, but certain cooking-related activities (e.g., utilizing a knife) are not safe due to the numbness in her hands.  *Id.*  Cognitively, J.M. experiences memory and word-finding difficulties.  *Id.* at 52-53.

### D. The ALJ's Decision

The ALJ ultimately determined that J.M. was not disabled at step five of the disability determination.  *Id.* at 33.  At step one, the ALJ concluded that J.M. had not engaged in substantial gainful activity since September 30, 2016, her alleged onsite date.  *Id.* at 18.  Subsequently, at step two, the ALJ determined that J.M.'s neuropathy, cirrhosis of the liver, depression, and generalized anxiety constituted severe impairments, but that her hepatic encephalopathy, hepatic ascites, edema in extremities, chronic fecal incontinence and bladder incontinence, macrocytic anemia, portal hypertension, jaundice, and polysubstance abuse were not severe.  *Id.*  For each of the latter conditions, the ALJ provided an explanation as to why the condition was not "severe."  *Id.* at 18-21.

At step three, the ALJ found that J.M.'s impairments, even in combination, did not meet or equal in severity any of the listed impairments, specifically considering Listings 12.04 (depressive disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  *Id.* at 21.  In making this determination, the ALJ addressed whether the paragraph B criteria of these listings were satisfied.  *Id.* at 21-23.  The ALJ found that J.M. had moderate limitations in two of the four functional categories of paragraph B, including her ability to understand, remember, or apply information, and her ability to concentrate, persist, or maintain pace.  *Id.* at 22.  By contrast, the ALJ determined that J.M. possessed only mild limitations in terms of her ability to interact with others and her ability to adapt and/or manage herself.  *Id.* at 22-23.  The ALJ thus concluded that J.M. did not meet the paragraph B criteria because she did not have two marked limitations or one extreme limitation in the functional categories.  *Id.* at 23.

The ALJ further found that J.M. did not meet the paragraph C criteria, either.  *Id.*

14

At step four, the ALJ found that J.M. had the residual functional capacity ("RFC") to perform:

> light work [] except she can: occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; never work around heights or hazardous machinery; she can perform simple and routine tasks equivalent to unskilled work with a maximum SVP [] of 2; and frequently reach, handle and finger.

*Id.* at 23.  In reaching this RFC, the ALJ found that J.M.'s medically determinable impairments could reasonably cause the symptoms she alleged but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.*  In support, the ALJ noted that "the objective medical evidence does not support the level of symptomology that [J.M.] alleged." *Id.* at 28.

The ALJ explained that the opinions of state agency medical consultants, Drs. Amon and Williams, were persuasive regarding the work J.M. was able to perform. *Id.* at 28.  The ALJ found the opinions of psychological consultative examiner, Dr. Bowerman, and state agency psychological consultant, Dr Westra, only partially persuasive. *Id.* at 29.  Finally, the ALJ found unpersuasive the opinions of J.M.'s treating family medicine provider, Dr. Sand, and emergency medicine physician, Dr. Fratkin. *Id.* at 28-29.

In conjunction with the RFC assessment, the ALJ further noted that J.M.'s neuropathy, cirrhosis, depression and anxiety, along with pain symptoms, cause her discomfort and impact her concentration and focus. *Id.* at 30.  However, the ALJ additionally explained that:

> [T]he objective medical records indicate that [J.M.] has been treated for these conditions in a conservative manner.  The evidence shows that [J.M.] has suffered no neurological deficits and she is capable of ambulation without an assistive device.  There is nothing in the record to indicate that such a device is medically necessary.  [J.M] has also not shown any mental or adaptive deficits consistent with those of a disabled person. In fact, the evidence demonstrates she is capable of a wide range of activities of daily living.  She also responded well to psychiatric medications prescribed by her primary care doctor, and she has not sought mental health treatment from a specialist.  While [J.M.]'s conditions may cause her to have some restrictions and limitation with work[-]related activities, the evidence in file indicates that those limitations are not severe enough to keep her from working with the [RFC] assessed.

*Id.* at 30-31.

1   The ALJ subsequently determined that J.M. was unable to perform her past relevant work

2   as a flight attendant, security officer, front desk clerk, or medical assistant based on her existing

3   RFC. *Id.* at 31.

4   At step five, the ALJ relied on the testimony of a vocational expert ("VE") in concluding

5   that J.M. could perform a limited range of light work, including as a cashier, routing clerk, and/or

6   housekeeper. *Id.* at 32.  The ALJ thus found J.M. not disabled at step five. *Id.* at 33.

7   **III.    ISSUES FOR REVIEW**

8   J.M. seeks reversal of the Commissioner's denial of benefits for three reasons, arguing that:

9   (1)    the ALJ erred in evaluating the persuasiveness of her treating physician, Dr. Sand's

10   November 2019 opinion regarding her work capacity;

11   (2)    the ALJ improperly rejected J.M.'s testimony without providing clear and

12   convincing reasons for doing so; and

13   (3)    the ALJ failed to find numerous other impairments -- including her hepatic

14   encephalopathy, chronic fecal/bladder incontinence, end stage liver disease, decreased

15   memory and mental function, and muscle pain -- to be "severe" at step two.

16   **IV.    DISCUSSION**

17   **A.    Standard of Review**

18   District courts have jurisdiction to review the final decisions of the Commissioner and may

19   affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

20   hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).  "This court may set aside the

21   Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

22   error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at

23   1097.  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to

24   support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389,

25   401 (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than

26   preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

27   1988) (internal citation omitted).  Even if the Commissioner's findings are supported by

28   substantial evidence, the decision should be set aside if proper legal standards were not applied

United States District Court
Northern District of California

16

when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.   ALJ's Rejection of Treating Physician, Dr. Sand's Opinion

Dr. Sand was J.M.'s treating physician and had followed J.M.'s care for no less than five visits and for nearly one year following her October 2018 hospitalization.  A.R. 658, 1122, 1117, 1695, 1691.  The ALJ rejected Dr. Sand's opinion as unpersuasive, and in doing so, erred.  *Id.* at 28.

### 1.   Legal Standards

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).  However, the regulations regarding evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including SSR 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims protectively filed after March 27, 2017, as is the case here.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a), 416.920c(a).

The new regulations provide that the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  20 C.F.R. § 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors."  20 C.F.R. § 416.920c(a)-(c).  "Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still

1    'articulate how [they] considered the medical opinions' and 'how persuasive [they] find all of the

2    medical opinions.' " *Christopher Charles A. v. Comm'r of Soc. Sec.*, No. C19-5914-MLP, 2020

3    WL 916181, at *2 (W.D. Wash. Feb. 26, 2020) (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1),

4    416.920c(a) and (b) (1)).

5         As with all other determinations made by the ALJ, the ALJ's persuasiveness explanation

6    must be supported by substantial evidence.  *See Patricia F. v. Saul*, No. C19-5590-MAT, 2020

7    WL 1812233, at *4 (W.D. Wash. Apr. 9, 2020) (citing 82 Fed. Reg. at 5852) (finding that, under

8    the new regulations, "[t]he Court must . . . continue to consider whether the ALJ's analysis has the

9    support of substantial evidence"); *J.B. v. Kijakazi,* No. 20-cv-06231-VKD, 2022 WL 282513, at

10   *3 (N.D. Cal. January 31, 2002).

11        The two "most important factors for determining the persuasiveness of medical opinions

12   are consistency and supportability," which are the "same factors" that "form[ed] the foundation of

13   the [prior] treating source rule."  Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.  The ALJ is

14   required to explicitly address supportability and consistency in their decision.  20 C.F.R. §

15   404.1520c(b)(2).  With respect to "supportability," the new regulations provide that "[t]he more

16   relevant the objective medical evidence and supporting explanations presented by a medical

17   source are to support his or her medical opinion(s) or prior administrative medical finding(s), the

18   more persuasive the medical opinions or prior administrative medical finding(s) will be."  20

19   C.F.R. § 416.920c(c)(1).  The regulations provide that with respect to "consistency," "[t]he more

20   consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence

21   from other medical sources and nonmedical sources in the claim, the more persuasive the medical

22   opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

23        Typically, the ALJ "may, but [is] not required to," explain how they considered the

24   remaining three factors listed in the regulations.  *Id.*  However, where two or more distinct medical

25   opinions are equally supported and considered, the ALJ is required to articulate how they

26   considered factors other than supportability and consistency, including the treatment relationship.

27   20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *see also Ceja v. Comm'r of Soc. Sec.*, No. 1:20-

28   CV-01267-EPG, 2021 WL 4690742, at *1 (E.D. Cal. Oct. 7, 2021).

United States District Court
Northern District of California

18

The third factor, relationship with the claimant, is split into five sub-factors.  20 C.F.R. §§ 404.1520c(c)(3), 416.927c(c)(3).  When analyzing the relationship with the claimant, the adjudicator should consider:  (1) the length of the treatment relationship; (2) the frequency of examinations; (3) the purpose of the treatment relationship; (4) the extent of the treatment relationship; and (5) whether there was an examining relationship.  *Id.*  In evaluating how the "relationship with the claimant" affects the weight that should be given to medical opinions, the regulations elaborate as follows regarding each of the five sub-factors:

> (i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

> (ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

> (iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

> (v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c(c)(3)(i)-(v).

Specialization, the fourth factor, suggests that a medical opinion is more persuasive if the source is a specialist in an area relevant to the claimant's conditions.  20 C.F.R. §§ 404.1520c(c)(4), 416.927c(c)(4).  Finally, the catch-all provision, "other factors," permits adjudicators to consider "other factors that tend to support or contradict" a medical opinion.  20 C.F.R. §§ 404.1520c(c)(5); 416.927c(c)(5) (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements.").

J.M. argues that the new regulations did not impact Ninth Circuit precedent requiring deference to treating physicians. Accordingly, J.M. contends that the ALJ was still required to provide specific and legitimate reasons for rejecting Dr. Sand's opinions.  The Commissioner did not respond to this argument.

The Social Security Administration ("SSA") is a regulatory agency with "broad authority to interpret the statutes [it is] charged with applying, [and] as long as [its] regulations are not arbitrary and capricious or contrary to the statute, . . .  courts must defer to validly adopted regulatory interpretations." *George D.D.L. v. Saul*, No. 20-cv-03552-SK, 2021 WL 5205600, at *3 (N.D. Cal. Nov. 9, 2021) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984)); *see also Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (holding that SSA interpretation of duration requirement for disability benefits was entitled to deference under *Chevron*).  An agency's contrary interpretation will supersede a prior judicial construction unless the "prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *George D.D.L.*, 2021 WL 5205600 at *3 (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 982 (2005)).

The treating physician rule, as determined by the Ninth Circuit, "was not derived from the unambiguous terms of the statute," *George D.D.L.*, 2021 WL 5205600 at *3, but was instead "originally developed by Courts of Appeals as a means to control disability determinations by administrative law judges under the Social Security Act." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003); *see also Agans v. Saul*, No. 2:20-cv-00508 AC, 2021 WL 1388610, at *6 (E.D. Cal. Apr. 13, 2021) (describing the source and evolution of the treating physician rule).  "When the SSA later adopted regulations approving and formalizing use of the rule in the Social Security disability program, the agency noted that '[n]one of the circuit courts of appeals has held that its treating physician rule is required by the Act or Constitution.'" *George D.D.L.*, 2021 WL 5205600 at *3 (quoting Final Rules, Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 (1991)).  Accordingly, the SSA's new regulations regarding the examination of and weight given to medical providers supersede the Ninth Circuit's

1   treating physician rule.  *Id.*; *see also Darrell F. v. Kijakazi*, No. 20-CV-06013-SK, 2021 WL

2   5584764, at *3 (N.D. Cal. Nov. 30, 2021) (concluding "the SSA's new regulations regarding the

3   examination of and weight given to medical providers supersede the Ninth Circuit's treating

4   physician rule; addressing the ALJ's evaluation of the medical opinions in accordance with the

5   new regulations"); *Barrios v. Saul*, No. 20-cv-04598-YGR, 2021 WL 4311463, at *3 (N.D. Cal.

6   Sept. 22, 2021) ("In weighing medical opinions, for claims filed on or after March 27, 2017, new

7   regulations apply that change the framework for how an ALJ must weigh medical opinion

8   evidence."); *Agans*, 2021 WL 1388610, at *7 (rejecting argument that the new regulation does not

9   override prior caselaw establishing the treating physician rule and finding that the new regulation

10  displaces contrary, pre-existing caselaw).

11       However, "[i]t remains to be seen whether the new regulations will meaningfully change

12  how the Ninth Circuit determines the adequacy of an ALJ's reasoning and whether the Ninth

13  Circuit will continue to require that an ALJ provide 'clear and convincing' or 'specific and

14  legitimate reasons' in the analysis of medical opinions, or some variation of those standards."

15  *Joseph Perry B. v. Saul*, No. SACV 20-1196-KS, 2021 WL 1179277, at *3 (C.D. Cal. Mar. 29,

16  2021) (citing *Patricia F.*, 2020 WL 1812233 at *3); *see also T.N. v. Kijakazi,* No. 20-cv-04946-

17  TSH, 2021 WL 4553581, at *4 (N.D. Cal. Oct. 5, 2021); *Timothy Mitchell B. v. Kijakazi*, No.

18  5:20-cv-01529-AFM, 2021 WL 3568209, at *5 (C.D. Cal. Aug. 11, 2021); *Madison L. v. Kijakazi*,

19  No. 20-cv-06417-TSH, 2021 WL 3885949, at *4 (N.D. Cal. Aug. 31, 2021); *Agans*, 2021 WL

20  1388610, at *7.

21       The Ninth Circuit previously required an ALJ to provide "clear and convincing reasons

22  that are supported by substantial evidence" to reject an uncontradicted opinion of a treating or

23  examining physician.  *Trevizo*, 871 F.3d at 675; *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th

24  Cir. 2014).  Alternatively, "[i]f a treating or examining doctor's opinion is *contradicted* by another

25  doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are

26  supported by substantial evidence." *Trevizo*, 871 F.3d at 675. An ALJ "can meet this burden by

27  setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating

28  his interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747,

United States District Court
Northern District of California

751 (9th Cir. 1989)).

Some district courts have continued to apply the "clear and convincing" and "specific and legitimate" standards as a "benchmark against which the Court evaluates [the ALJ's] reasoning." *See, e.g., Kathleen G. v. Comm'r of Soc. Sec.*, No. C20-461 RSM, 2020 WL 6581012, at *3 (W.D. Wash. Nov. 10, 2020). Others, including courts in this district, have not. *See, e.g., Madison L.*, 2021 WL 3885949, at *4; *V.W. v. Comm'r of Soc. Sec.*, No. 18-cv-07297-JCS, 2020 WL 1505716, at *13 (N.D. Cal. Mar. 30, 2020); *J.C. v. Kijakazi,* No. 20-CV-06746-TSH, 2021 WL 5744485, at *4 (N.D. Cal. Dec. 2, 2021).

The Court is persuaded that Ninth Circuit precedent requiring the ALJ to provide "clear and convincing" or "specific and legitimate" reasons for rejecting a treating physician's opinion does not apply to the ALJ's decision here to reject Dr. Sand's opinion under the current regulations in effect. There are limited circumstances in which the Ninth Circuit's precedent is not controlling, and this is one of them. *See Lambert v. Saul*, 980 F.3d 1266, 1268, 1274 (9th Cir. 2020) (noting that "[t]hose circumstances include the intervening higher authority of an administrative agency's authoritative and reasonable interpretation of a statute"); *see also J.C.*, 2021 WL 5744485 at *4 (discussing *Lambert*); *Madison L.*, 2021 WL 3885949 at *4 (same). In *Lambert*, the Ninth Circuit deferred to the SSA's contrary interpretation of the 1984 Reform Act, which found that there was no presumption of continuing disability after a prior disability determination. 980 F.3d at 1268. In deferring to the agency's interpretation despite its own contrary precedent, the Ninth Circuit concluded that "the SSA's authoritative interpretation of the Social Security Act displaces our prior precedents on the issue of a presumption of continuing disability." *Id.* at 1275; *see also J.C.*, 2021 WL 5744485 at *4 (discussing *Lambert*); *Madison L.*, 2021 WL 3885949 at *4 (same). Given the Ninth Circuit's holding in *Lambert*, the Court concludes "it must defer to the new regulations, even when they conflict with judicial precedent," and that the new regulations do not require that an ALJ articulate "clear and convincing" or "specific and legitimate" reasons for rejecting a treating physician's opinion. *See Timothy Mitchell B*, 2021 WL 3568209, at *5; *Agans*, 2021 WL 1388610, at *7.

22

### 2.    Analysis

J.M. saw Dr. Sand regularly, and, as a result, the record contains multiple opinions and findings from Dr. Sand.  A.R. 658, 1122, 1117, 1695, 1691.  Where a single medical source provides multiple opinions or findings, like those of Dr. Sand, the regulations provide that an ALJ "will articulate how [the ALJ] considered the medical opinions or prior administrative medical findings from that medical source *together in a single analysis* using the factors listed in paragraphs (c)(1) through (c)(5)." 20 C.F.R. § 404.1520c(b)(1) (emphasis added) (explaining that "voluminous case records" necessitate source-level articulation).   Accordingly, given the above, the ALJ's single statement that "the opinion of family medicine provider Dr. Sand [is] unpersuasive," must be viewed by the court as a rejection of all of Dr. Sand's findings and opinions.  A.R. 28.

 However, in conjunction with this issue, the parties have focused specifically on Dr. Sand's November 2019 opinion that that J.M. was capable of less than sedentary work.  A.R. 1386-89; Pl.'s Mot. for Summ. J. at 7; Pl.'s Reply Br. at 4; Def.'s Cross-Mot. at 2.

The ALJ offered three reasons in support of the conclusion that Dr. Sand's opinion was unpersuasive, including that:

(1) it was not supported by objective medical evidence that demonstrated J.M. had "very mild axonal polyneuropathy;"

(2) it was not supported by objective medical evidence that revealed J.M's cirrhosis "had shown significant improvement" after a year of abstinence from alcohol; and

(3) it was inconsistent with the opinions of state agency medical consultants, Drs. Amon and Williams that J.M. could perform a range of light work.

A.R. 28.

#### a.    Nerve Conduction Study

The ALJ specifically found that J.M.'s neuropathy constituted a severe impairment that significantly limited her ability to perform basic work activities.  *Id.* at 18.  However, in rejecting J.M.'s treating physician's opinion, the ALJ cited to a single nerve conduction study conducted more than one year prior to Dr. Sand's November 2019 opinion.  *Id.* at 28.  That study confirmed

23

1   that J.M. suffered from "[r]ight peroneal axonal loss," and "[b]orderline conduction velocities and

2   amplitudes for age, may be consistent with very mild axonal polyneuropathy." *Id.* at 1076.

3       The ALJ, however, failed to explain how this cryptic test result undermines Dr. Sand's

4   November 2019 observation that J.M. was experiencing increasing and constant extremity

5   weakness or pain and could not sit or stand longer than a few minutes due to pain. *Id.* at 1692,

6   1386. Dr. Sand's November 2019 assessment of J.M.'s neuropathy was longitudinally supported

7   by J.M.'s medical records and testimony over the relevant period of time, including her care at

8   Redwoods Rural Health Clinic, St. Joseph Hospital, hepatologist Dr. Wakil, and, notably, the

9   records of Dr. Michael Fratkin (whose testimony the ALJ also found unpersuasive). *See id.* at

10  953, 992-93, 1006, 1117. Additionally, as discussed in more detail below, Dr. Sand had an

11  ongoing treatment relationship with J.M.

12      Because Dr. Sand's assessment of J.M.'s neuropathy is consistent with and supported by

13  the record, the ALJ's determination that it was "unpersuasive" based on the single nerve

14  conduction study is not supported by substantial evidence. *See* 20 C.F.R. § 416.920c(c)(1) & (2).

15              **b.**      **Nurse Practitioner's Observation**

16      Again, like J.M.'s neuropathy, the ALJ specifically found that J.M.'s history of cirrhosis of

17  the liver constituted a severe impairment that significantly limited her ability to perform basic

18  work activities. A.R. 18. Nevertheless, the ALJ again cited to a one-time observation in the

19  record regarding J.M.'s cirrhosis as a reason for rejecting Dr. Sand's opinion. *Id.* at 28. That

20  October 2019 observation from CPMC nurse practitioner Thomas noted that J.M.'s cirrhosis had

21  improved following her year-long abstinence from alcohol. *Id.* at 1622-23.

22      Interestingly, the nurse practitioner's observation is consistent with Dr. Sand's own

23  September 2019 observation that J.M.'s cirrhosis had improved. *Id.* at 1695. However, a couple

24  of months later, Dr. Sand's subsequent November 2019 assessment departed from his September

25  2019 conclusion (and that of the nurse practitioner). In November 2019, Dr. Sand found that

26  J.M.'s cirrhosis and overall condition were "declining." *Id.* at 1692. This variation in Dr. Sand's

27  findings over those few months is, in fact, consistent with J.M.'s medical records and testimony as

28  a whole, which illustrate that her symptoms and impairments fluctuated fairly frequently. *See,*

United States District Court
Northern District of California

24

*e.g., id.* at 1125 (noting that J.M. "had some good days and many bad ones").  The improvement to J.M.'s cirrhosis, as seen by the nurse practitioner in October 2019, does not undermine the disabling nature of J.M.'s cirrhosis, which had fluctuated over time.  *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (ALJ may not simply "pick out a few isolated instances of improvement over a period of months or years" but must interpret "reports of 'improvement' . . . with an understanding of the patient's overall well-being and the nature of her symptoms.");  *Ghanim*, 763 F.3d at 1162 (ALJ should take "holistic review of the record" in evaluating medical opinions).  Consequently, it does not undermine Dr. Sand's November 2019 opinion, either.

Moreover, cirrhosis was only one of J.M.'s many impairments that Dr. Sand took into consideration in his November 2019 assessment.  That assessment specifically accounted for J.M.'s alcoholic liver disease, neuropathy, fatigue, memory, confusion, pain, anxiety, and depression as well.  A.R. 1386.  Accordingly, the nurse practitioner's single notation regarding J.M.'s cirrhosis in October 2019 does not undermine Dr. Sand's overall opinion, which was supportable, consistent, and based on a treating relationship with J.M.  For these reasons, the ALJ's determination that the opinion was unpersuasive based on the single nerve conduction study is not supported by substantial evidence.

### c.    State Agency Medical Consultants' Opinions

Finally, the ALJ cited to the January and October 2019 opinions from consulting, non-examining physicians Drs. Amon and Williams as reasons for rejecting Dr. Sand's opinions, noting that Dr. Sand's opinion was inconsistent with their opinions. *Id.* at 97, 140.  As set forth above, Drs. Amon and Williams opined solely regarding J.M.'s RFC, concluding that she had the ability to perform light work, but was additionally limited to standing or walking for two hours in an eight-hour workday.  *Id.*  By contrast, Dr. Sand proffered that J.M. was limited to sitting and/or standing and walking for less than two hours in an eight-hour workday.  *Id.* at 1387.

The ALJ stated simply that the opinions of Drs. Amon and Williams were persuasive because they were "supported by the objective medical evidence, which the consultant[s] had the opportunity to review, including ultrasounds of the abdomen, echocardiogram, hospitalization reports, laboratory reports . . . . [and] with the claimant's reported activities of daily living."  *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

28.  It is nearly impossible, though, to ascertain the specific records and testimony to which the ALJ refers because the record is voluminous in this case and the ALJ did not provide citations to the record evidence that the ALJ found supported Drs. Amon's and William's opinions.  *See id.* at 28.

Moreover, contrary to Dr. Sand's opinions and records, Dr. Amon's assessment itself offers no explanation, reasoning, or citation to J.M.'s medical records in support of his conclusions regarding J.M.'s functional limitations.  *Id.* at 97-98.  Dr. William's October 2019 RFC assessment is no different.  *Id.* at 140-41.   It is therefore unclear to the court how the ALJ determined that Drs. Amon's and William's opinions were indeed "supportable," and more consistent with the record than Dr. Sand's opinion.  *See* 20 C.F.R. §§ 404.1520(c)(1); 416.920c(c)(1) (under the supportability factor, more weight is generally accorded to medical opinions that are supported by "relevant medical evidence" and the medical source's explanation).

By contrast, Dr. Sand's November 2019 opinion regarding J.M.'s RFC was both supported and consistent with the record as a whole for all of the reasons already stated above.  It was also the most recent RFC opinion in the record, was issued following examination of J.M., and was based on Dr. Sand's observations, clinical findings, and examinations that progressed over the course of one year.  Accordingly, Dr. Sand's opinion was both more supportable and consistent than the opinions of Drs. Amon and Williams.  *See* 20 C.F.R. § 416.920c(c)(1) & (2).

Alternatively, even if the opinions of Drs. Amon and Williams could be considered supported by and consistent with the record as whole, the ALJ nevertheless erred in rejecting Dr. Sand's testimony.  Given that Dr. Sand's November 2019 opinion was, at a minimum, equally supportable and consistent, the ALJ was then required to consider the treatment relationship between J.M. and each of the physicians.  20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (requiring ALJ to articulate how they considered factors other than supportability and consistency, including the treatment relationship, only when they find two or more medical opinions about the same issue equally well-supported and consistent with the record).

Had the ALJ here considered the length, frequency, purpose, nature, and extent of treating relationship, the ALJ would have found that Dr. Sand's opinion was entitled to more persuasive

1   weight than those of Drs. Amon and Williams.  *See* 20 C.F.R. § 404.1520c(c)(3)(i)-(v); *see also*

2   *Derek M. v.Comm'r of Soc. Sec*., No. 3:20-cv-01713-AC, 2022 WL 443980 at *9 (D. Or. February

3   14, 2022) (treating physician's frequent appointments and relationship with claimant should have

4   made the opinion more persuasive under 20 C.F.R. § 404.1520c(c)(3)).  First, the record shows

5   that Dr. Sand treated J.M. from December 2018 until at least November 2019 following her

6   October 2018 hospitalization, during which J.M. had a minimum of five visits.  A.R. 658, 1122,

7   1117, 1695, 1691.  Dr. Sand's notes and opinions demonstrate that his purpose was to treat J.M.

8   for all her impairments, both physical and mental, including those impairments that the ALJ

9   subsequently found severe and non-severe.  *Id.*

10          Dr. Sand prescribed medications and discontinued medications, monitored and treated

11   J.M.'s pain, and reviewed tests and other records related to J.M.'s physical and mental health,

12   including computed tomography ("CT") scans and MRIs of J.M.'s liver mass.  *See, e.g., id.* at 912

13   (prescribing medication for incontinence, decreasing dosage of Risperdal and prednisone,

14   increasing Lactulose medication); *id.* at 1125 (prescribing medication for high ammonia level,

15   recommending methadone to relieve pain); *id.* at 1121 (discussing recent CT of liver); *id.* at 1122

16   (adjusting gabapentin, temazepam, discussing medication that helped J.M. with "thinking and

17   memory").  Dr. Sand also examined J.M. and was therefore able to make personal observations

18   and assessments of the scope and extent of her impairments and symptoms.  *See id.* at 1705

19   (examining J.M. and noting that her prior jaundice had resolved and her "abdominal girth is much

20   reduced").

21          By comparison, neither Dr. Amon nor Dr. Williams had a treating relationship with J.M.

22   They did not examine J.M., and they each prepared a singular report and opinion based on their

23   review of J.M.'s medical records.  Moreover, their reports fail to cite to the specific medical

24   evidence that supports their conclusions and findings.  *Id.* at 97-98, 140-41.

25          For all of these reasons, consideration of the relevant sub-factors reveals that Dr. Sand's

26   relationship with J.M. should have made his opinion more persuasive than those of Drs. Amon and

27

28

United States District Court
Northern District of California

1  Williams.  The ALJ erred in concluding otherwise.  *See* 20 C.F.R. § 404.1520c(c)(3)(i)-(v).[8]

2  **C.      Rejection of J.M.'s Symptom Testimony**

3          In conjunction with the determination of J.M.'s RFC, the ALJ rejected J.M.'s testimony

4  regarding the "alleged intensity, persistence, and limiting effects of [her] symptoms" as

5  "inconsistent with the objective medical evidence."  A.R. 28.  The ALJ provided six reasons in

6  support of the rejection based on "the longitudinal medical evidence:"

7          (1) J.M.'s motor examinations revealed normal strength;

8          (2)  J.M.'s sensation and gait have been normal;

9          (3)  a September 10, 2018 nerve conduction study suggested "very mild axonal

10  polyneuropathy;"

11          (4)  hepatologist Dr. Wakil's December 14, 2018 observation regarding J.M.'s cirrhosis;

12          (5) J.M.'s records did not show any mental health treatment beyond October 24, 2018; and

13          (6) the evidence demonstrates that [J.M.] is capable of a wide range of activities of daily

14  living.

15  *Id.* at 28, 30.

16          **1.      Legal Standards**

17          In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.

18  *Trevizo*, 871 F.3d at 678.  The ALJ must first determine "whether the claimant has presented

19  objective medical evidence of an underlying impairment 'which could reasonably be expected to

20  produce the pain or other symptoms alleged.' " *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d

21  1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).

22  If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can

23  reject the claimant's testimony as to the severity of the symptoms " 'only by offering specific,

24  clear and convincing reasons for doing so.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.

25  2008) (quoting *Smolen*, 80 F.3d at 1281).  These reasons must be "sufficiently specific to permit

26

27  [8] The court also alternatively concludes that if it were to apply Ninth Circuit precedent in effect
    prior to the 2017 Revisions, for the same reasons set forth above, the ALJ failed to provide
28  "specific and legitimate reasons" supported by substantial evidence for rejecting Dr. Sand's
    opinion.  *See Trevizo*, 871 F.3d at 675.

United States District Court
Northern District of California

1   the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

2   *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v.*

3   *Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

4           **2.   Analysis**

5        Here, the ALJ found that "[J.M.]'s medically determinable impairments could reasonably

6   be expected to cause the alleged symptoms" without pointing to any affirmative evidence of

7   malingering.  A.R. 25.  Thus, the ALJ needed to provide "specific, clear and convincing reasons"

8   for rejecting J.M.'s testimony concerning the intensity, persistence, and limiting effects of her

9   symptoms.  *Tommasetti*, 533 F.3d at 1039.

10           **a.  J.M.'s Motor Examinations, Sensations, Gait**

11        In support of the rejection of J.M.'s symptom testimony, the ALJ asserted that the

12   longitudinal medical evidence revealed that J.M. possessed normal strength, sensation, and gait.

13   *See* A.R. 28 (citing A.R. 420, 636, 640, 698, 707, 769, 773, 1239, 1413, 1445, 1449, 1582, 1825,

14   and 2146).

15        The court's review of J.M.'s extensive medical records reveals that the ALJ has, in essence,

16   "cherry-picked" notations from several visits and hospitalizations during which J.M.'s strength,

17   sensation, and gait were observed but were not being tested.  Most, if not all, of the record

18   citations are to observations regarding J.M.'s presentation that were secondary to the issues for

19   which J.M. was being seen and examined.  For example, the ALJ cites to an observation that J.M.

20   had a "normal appearance" at the time she was admitted to St. Joseph Hospital in October 2018 for

21   "liver failure management." *Id.* at 698, 703; *see also id.* at 773 (Dr. Buntin observes "no focal

22   motor weakness" while J.M. lies in bed during her October 2018 hospitalization); *id.* at 636 (St.

23   Joseph's hospital cardiologist observes that J.M.'s "gait and stance were normal" during visit that

24   revealed an enlarged liver and jaundiced skin and resulted in J.M.'s referral to the emergency room

25   and subsequent hospitalization).  Additionally, several of the citations are to medical records of

26   questionable relevance that pre-dated J.M.'s September 30, 2016, onset date and the bulk of other

27   medical records in her case.  *See id.* at 1582 (University of California San Diego doctor's note

28   shows "normal gait" during June 2011 treatment for sexually transmitted disease, insomnia, and

1   anxiety); *id.* at 1445, 1449 (October 2015 doctor's notes observing normal strength and gait at

2   follow-up visit post-hospitalization for uterine fibroids and menorrhagia).

3          Furthermore, the ALJ failed to clearly and convincingly explain how the cited medical

4   evidence was inconsistent with J.M.'s testimony regarding her fatigue, pain, soreness, and

5   neuropathy.  *Id.* at 52, 55, 307, 309, 351, 353, 355.  Because the ALJ improperly "cherry-picked"

6   the evidence regarding J.M.'s strength, gait, and sensation, and has failed to identify how such

7   instances are inconsistent with J.M.'s testimony, these instances do not provide specific, clear, and

8   convincing reasons for rejecting J.M.'s symptom testimony.  *See Diedrich v. Berryhill*, 874 F.3d

9   634, 642 (9th Cir. 2017) (improper for ALJ to "cherry-pick" absence of certain symptoms from

10  medical evidence as opposed to undertaking a "broader development" of the evidence in its

11  entirety).

12                          **b.   Nerve Conduction Study**

13         The ALJ also cites to the same nerve conduction study referenced above in rejecting J.M.'s

14  symptom testimony as the ALJ did in rejecting testimony from J.M.'s treating physician, Dr. Sand.

15  A.R. 28, 1076 (diagnosing J.M. with "[r]ight peroneal axonal loss," and "[b]orderline conduction

16  velocities and amplitudes for age, may be consistent with very mild axonal polyneuropathy").

17  The ALJ does not, however, explain how that single, isolated test result from September 2018, *id.*

18  at 1076, undermines J.M.'s own testimony regarding her neuropathy or the other overwhelming

19  medical evidence of J.M.'s neuropathy in the record.  *See id.* at 57-59, 992-93, 1006, 953, 1117.

20  Accordingly, viewing the record as a whole, the ALJ's citation to this isolated test result is not a

21  clear and convincing reason to discredit J.M.'s symptom testimony.  *See Garrison*, 759 F.3d at

22  1017–18 (noting that "symptoms wax and wane in the course of treatment").

23                      **c.   Dr. Wakil's December 14, 2018, Opinion**

24         The ALJ additionally cites to a December 14, 2018, note from Dr. Wakil, an examining

25  hepatologist following J.M.'s October 2018, hospitalization, in which Dr. Wakil stated that he

26  could "not say if [J.M.] has cirrhosis or not," noting improvement since J.M. had stopped drinking

27  alcohol.  A.R. 953.  However, as noted above, during the same visit, Dr. Wakil also opined that

28  J.M. suffered from "advanced liver fibrosis," "significant underlying chronic liver disease," and

United States District Court
Northern District of California

painful neuropathy that may not resolve over time. *Id.*

Again, here, the ALJ engaged in "cherry-picking" both from the record as a whole and from Dr. Wakil's singular December 2018, assessment.  As discussed above regarding Dr. Sand's testimony, the overall medical records and testimony clearly demonstrate that J.M.'s cirrhosis "waxed and waned" over the years.  *See, e.g., id.* at 1125 (noting that J.M. "had some good days and many bad ones"); *id.* at (September 2019 observation noting that J.M.'s cirrhosis had improved).  "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017.  The medical record cited by the ALJ does not provide substantial evidence for discrediting J.M.'s description of her symptoms, especially since cirrhosis was only one of many severe impairments from which J.M. suffered.  A.R. 18.  The ALJ was required to view Dr. Wakil's statement regarding J.M.'s cirrhosis in a broader context, and in failing to do so, did not articulate a clear and convincing reason for rejecting J.M.'s symptom testimony.  *See Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (holding that the ALJ "must interpret reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms.").

### d.  Post- October 24, 2018 Mental Health Treatment

The ALJ also rejected J.M.'s symptom testimony as pertained to depression and anxiety based on the absence of treatment notes after she was discharged from the hospital on October 24, 2018.  A.R. 28.  This is a mischaracterization, though, of J.M.'s mental health treatment.  In fact, the ALJ actually noted that J.M. had been prescribed medications to treat her mental health impairments, including Effexor, Ativan, and Lorazepam, *id.* at 26, and that she "responded well to psychiatric medications prescribed by her primary care doctor." *Id.* at 30.  Moreover, J.M. appears to have indeed received mental health treatment from palliative care treating physician, Dr. Sand regularly following her October 18, 2018 hospitalization, as evidenced by several treatment notes discussing J.M.'s problems, progress, and medications.  *See id.* at 909-11 (December 10, 2018 treatment notes); *id.* at 1117 (June 18, 2019 letter); *id.* at 1695 (September 11, 2019 treatment

1    note).

2         Furthermore, the ALJ's reason does not constitute a clear and convincing reason for

3    rejecting J.M.'s symptom testimony under Ninth Circuit law.  "Conservative medical treatment can

4    only be used as a basis for discounting a claimant's testimony where the ALJ identifies the more

5    aggressive treatment options that were available and appropriate and considers the reasons the

6    claimant did not pursue more aggressive treatment."  *Robert M. v. Saul*, No. 20-CV-03481-JSC,

7    2021 WL 2651363, at *5 (N.D. Cal. June 28, 2021) (citing *Lapeirre-Gutt v. Astrue*, 382 Fed.

8    App'x 662, 664 (9th Cir. 2010) ("[A]n ALJ errs in relying on conservative treatment if the record

9    does not reflect that more aggressive treatment options are appropriate or available."); *see also*

10   *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (internal citations and quotation marks omitted)

11   ("[A]n adjudicator must not draw any inferences about an individual's symptoms and their

12   functional effects from a failure to seek or pursue regular medical treatment without first

13   considering any explanations that the individual may provide, or other information in the case

14   record, that may explain infrequent or irregular medical visits or failure to seek medical

15   treatment.").  "The Ninth Circuit has repeatedly and particularly criticized the use of a lack of

16   treatment to reject mental complaints both because mental illness is 'notoriously underreported'

17   and because 'it is a questionable practice to chastise one with a mental impairment for the exercise

18   of poor judgment in seeking rehabilitation.' "  *Sababu v. Colvin*, No. 14-cv-05139-DMR, 2016 WL

19   1110264, at *9 (N.D. Cal. Mar. 22, 2016) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th

20   Cir. 1996)).

21        The ALJ accordingly erred by discrediting J.M.'s testimony on this ground.

22              **e.      Activities of Daily Living**

23        The ALJ did not explicitly reference J.M.'s daily activities in the laundry list of reasons for

24   rejecting J.M.'s symptom testimony.  A.R. 28.  However, in assessing J.M.'s RFC, the ALJ

25   implicitly rejected her testimony in concluding that "the evidence demonstrates [J.M.] is capable

26   of a wide range of activities of daily living."  *Id.* at 30.  Both parties assume this constitutes an

27   additional reason for the ALJ's rejection of J.M.'s testimony.  Pl. Mot. for Summ. J. at 15-16; Def.

28   Cross-Mot. for Summ. J. at 5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "[I]nconsistencies . . . between [a claimant's] testimony and [her] conduct [or] daily

2    activities" is a legitimate factor "in weighing a claimant's credibility." *Orn*, 495 F.3d at 636.

3    Daily activities can only be relied upon by the ALJ, though, "if a claimant is able to spend a

4    substantial part of his day engaged in pursuits involving the performance of physical functions that

5    are transferable to a work setting." *Id.* at 639. "The ALJ must make specific findings relating to

6    the daily activities and their transferability." *Id.* In addition, the Ninth Circuit has "repeatedly

7    warned that ALJs must be especially cautious in concluding that daily activities are inconsistent

8    with testimony about pain, because impairments that would unquestionably preclude work and all

9    the pressures of a workplace environment will often be consistent with doing more than merely

10   resting in bed all day." *Garrison*, 759 F.3d at 1016; *see also Smolen*, 80 F.3d at 1284 n.7 ("The

11   Social Security Act does not require that claimants be utterly incapacitated to be eligible for

12   benefits.").

13       Here, the ALJ failed to identify specific record evidence and explain how it undermined

14   J.M.'s largely consistent testimony about the impact of her impairments on her ability to work.

15   J.M.'s testimony established that her daily activities were actually quite limited and inconsistent

16   with work. She testified that she rarely leaves the house more than once or twice a week due to

17   her pain and nausea; that she needs someone to drive her and guide her when she is out of the

18   house; and that after leaving the house for a doctor visit, she often returns home and will need to

19   stay in bed for days to recover from the outing. A.R. 353-44, 52, 55; *see also id.* at 1110

20   (examining consultative psychologist Dr. Bowerman's description of J.M.'s daily schedule and

21   limitations). She was also consistent in describing that her illness "takes over," and that

22   sometimes she is only able to work for minutes on household chores before needing to rest. *Id.* at

23   51, 52-53, 59, 307, 351, 353.

24       The Ninth Circuit has made clear that an ALJ must specifically identify which testimony

25   they found not credible, and why. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).

26   The ALJ failed do so here with respect to J.M.'s daily activities. Moreover, "[t]he ability to talk on

27   the phone, prepare meals once or twice a day, occasionally clean one's room, and, with significant

28   assistance, care for one's daughter, all while taking frequent hours-long rests, avoiding any heavy

1  lifting, and lying in bed most of the day, is consistent with the pain" that may nevertheless render a
2  claimant like J.M. disabled.  *Garrison*, 759 F.3d at 1016.
3       In sum, the ALJ's rejection of J.M.'s symptom testimony was not supported by the
4  substantial weight of evidence.
5       **D.     ALJ's Determination of Severe Impairments at Step Two**
6       J.M. also argues that the ALJ erred in failing to find that multiple additional impairments
7  were "severe" at step two, including her: (1) hepatic encephalopathy; (2) chronic fecal/bladder
8  incontinence; (3) end stage liver disease; (4) decreased memory/mental function due to ammonia
9  levels; and (5) fatigue and muscle pain.  As noted above, at step two, the ALJ determined that
10  J.M.'s neuropathy, cirrhosis of the liver, depression, and generalized anxiety constituted severe
11  impairments.  A.R. 18-21.
12       J.M. concedes that this issue is moot if the court determines that a remand for an award of
13  benefits is an appropriate remedy based on ALJ error regarding one of the preceding issues.  Pl.
14  Mot. for Summ. J. at 16.  The Commissioner does not disagree.  *See* Def. Cross-Mot. for Summ. J.
15  at 6 (suggesting that any error in characterizing impairments as "severe" versus "non-severe" at
16  step two was nevertheless harmless because the ALJ considered all of the impairments challenged
17  above in assessing J.M.'s RFC at step four).
18       Because the Court concludes that the ALJ erred in rejecting Dr. Sand's opinion and J.M.'s
19  testimony and that, for the reasons set forth below, the appropriate remedy is remand for an award
20  of benefits, the Court agrees that this issue is moot and declines to reach it on this basis.
21       **E.     Remedy**
22       "A district court may affirm, modify, or reverse a decision by the Commissioner 'with or
23  without remanding the cause for a rehearing.'"  *Garrison*, 759 F.3d at 1019 (quoting 42 U.S.C. §
24  405(g)) (emphasis omitted).  "If additional proceedings can remedy defects in the original
25  administrative proceeding, a social security case should be remanded."  *Lewin v. Schweiker*, 654
26  F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits
27  under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for
28  rejecting evidence, whether claimant testimony or medical opinion;" (2) "there are [no]

United States District Court
Northern District of California

34

1   outstanding issues that must be resolved before a disability determination can be made" and

2   "further administrative proceedings would [not] be useful;" and (3) "on the record taken as a

3   whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041,1045 (9th Cir. 2017)

4   (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

5   a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

6   case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

7   as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

8   *Garrison*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and ambiguities."

9   *Treichler*, 775 F.3d at 1101.

10        J.M. argues that an award for benefits is warranted if the court credits either Dr. Sand's

11   opinion or J.M.'s testimony. The Commissioner, on the other hand, contends that remand is

12   appropriate because the record raises "serious doubt" of disability. The court disagrees with the

13   Commissioner and awards benefits under the credit-as-true rule.

14        First, for the reasons set forth above, the ALJ failed to provide legally sufficient reasons

15   for rejecting Dr. Sand's opinion and J.M.'s symptom testimony. Second, "there are [no]

16   outstanding issues that must be resolved before a disability determination can be made" and

17   "further administrative proceedings would [not] be useful." *Garrison*, 759 F.3d at 1021. At the

18   hearing, the VE testified that an individual who possessed the limitations assessed by Dr. Sand in

19   November 2019, and testified to by J.M. "would not be employable." *See* A.R. 1386-89 (Dr.

20   Sand's assessment); *id.* at 81-82 (March 3, 2020 hearing transcripts). Specifically, the VE testified

21   that "add[ing] the need for unscheduled breaks and absences to [either a light work or sedentary

22   work hypothetical where] unscheduled breaks and absences amount[ed] to twenty percent of work

23   time as being lost," would render one unemployable. *Id.* at 81. He explained that typically:

24   "[E]mployers will [allow] a ten percent diminishment of ability to remain on task. And that's based

25   on *unforeseen* emergencies, personal fatigue. . . . . Once you go past that, it's my opinion that you

26   would not be employable in the unskilled entry-level job base." *Id.*

27        Finally, "on the record taken as a whole, there is no doubt as to disability." *Garrison*, 759

28   F.3d at 1021. J.M.'s testimony and Dr. Sand's opinion, when credited as true, strongly suggest that

United States District Court
Northern District of California

1    J.M. would miss twenty percent of work, a marker that the VE testified made her unemployable.

2    J.M. attested in her Adult Function Reports and at her March 2020 hearing that she is unable to

3    work a full-time job because of her inability to show up consistently for work due to the pain,

4    fatigue, and nausea.  A.R. 312, 351, 358, 51, 64.  She stated that she often is bedridden for days

5    after leaving home for doctor appointments, and, as a result, she leaves home on a very infrequent

6    basis.  *Id.* at 308, 309, 354, 358, 52, 55.  Consistent with J.M.'s testimony, Dr. Sand opined that

7    she would need an unscheduled break from sitting or standing every fifteen minutes due to chronic

8    fatigue, pain, and the adverse effects of her medication.  *Id.* at 1387.  He further opined that she

9    would be able to sit and stand or walk less than two hours per day, and that she was "incapable of

10   even low stress work."  *Id.* at 1387, 1389.  That November 2019 functional assessment was

11   consistent with Dr. Sand's earlier June 2019 opinion.  *Id.* at 1117.

12           Carefully considering the record as a whole, the court has no "serious doubt" that J.M. is in

13   fact disabled.  *See Garrison,* 759 F.3d at 1021; *see also Revels v. Berryhill,* 874 F.3d 648, 668 n.8

14   (9th Cir. 2017) (explaining that where each of the credit-as-true factors is met, only in "rare

15   instances" does the record as a whole leave "serious doubt as to whether the claimant is actually

16   disabled").  Accordingly, the Court exercises its discretion and credits the erroneously discredited

17   evidence as true and remands this case for an immediate calculation and payment of benefits.

18   **V.      CONCLUSION**

19           For the reasons discussed above, J.M.'s motion is GRANTED, the Commissioner's motion

20   is DENIED, and the Commissioner's final decision that Plaintiff was not disabled is REVERSED

21   and REMANDED for an immediate calculation and award of benefits. The Clerk is instructed to

22   enter judgment accordingly and close the file.

23           **IT IS SO ORDERED.**

24   Dated:  March 2, 2022

25   _____

26   JOSEPH C. SPERO
     Chief Magistrate Judge

27

28

United States District Court
Northern District of California